## COMMONWEALTH *vs.* SALVATORE SICARI.

Middlesex. May 11, 2001. - August 10, 2001.

Present: MARSHALL, C.J., GREANEY, SPINA, SOSMAN, & CORDY, JJ.

*Evidence,* Admissions and confessions, Relevancy and materiality. *Practice, Criminal,* Admissions and confessions, Capital case. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights.

A criminal defendant did not, in the circumstances, invoke his right to terminate police questioning by remaining silent for an interval of thirty to forty minutes, after being confronted with evidence inconsistent with his prior statements to the police, in the middle of a lengthy interview, and after two written waivers. [736-749]

The admission in evidence at a murder trial of testimony regarding semen found at a murder scene that was consistent with the defendant's DNA was proper where it tended to prove that the defendant was physically present at the place where the victim was murdered, and the objections raised to its admission went to its weight rather than its admissibility, where the semen evidence was relevant and, even if it had been ruled more prejudicial than probative, its admission did not influence the jury, or had but very slight effect, and did not result in an unfair trial, in light of its limited significance at trial, the Commonwealth's brief and noninflammatory mention of the evidence in closing argument, and the overwhelming evidence of the defendant's guilt, apart from the semen evidence. [749-752]

This court declined to exercise its power under G. L. c. 278, § 33E, to reduce a verdict to murder in the second degree on the basis of the defendant's contention that his codefendant was convicted of murder in the second degree in a separate trial, in spite of what the defendant contended was the codefendant's greater level of culpability and his own cooperation with the authorities in finding the victim's body. [752-753]

INDICTMENTS found and returned in the Superior Court Department on December 11, 1997.

A pretrial motion to suppress evidence was heard by *Judith A. Cowin*, J., and the cases were tried before her.

*Dana Alan Curhan* (*Arthur L. Kelly* with him) for the defendant.

*Kimberly Diaz Peterson*, Assistant District Attorney (*James W. Sahakian*, Assistant District Attorney, with her), for the Commonwealth.

CORDY, J. Jeffrey Curley, the victim, disappeared from his East Cambridge neighborhood shortly after leaving his grandmother's house on the afternoon of October 1, 1997. He was ten years old. He was reported missing that evening when he failed to return home to his family and, by the next morning, the Cambridge police had joined in the search for the boy and had begun an investigation into his disappearance. After interviewing the victim's family, the police met one of the neighbors, Salvatore Sicari, who was engaged in the search and claimed to have seen the victim in the afternoon of the previous day. Thus began the first of four voluntary meetings between the police and Sicari, culminating in his admission to participating (along with Charles Jaynes) in the murder of the victim and the disposal of his body.[1]

Sicari appeals from his convictions of kidnapping and murder in the first degree, claiming that the incriminating statements he made to the Cambridge police should have been excluded from evidence because they were made after he had invoked his constitutional right to remain silent and to terminate the police interview. He also claims that it was prejudicial error to admit in evidence testimony regarding semen found at the murder scene that was consistent with Sicari's DNA. Finally, he asks this court to exercise its power pursuant to G. L. c. 278, § 33E, to reduce the verdict to murder in the second degree.

We hold that, in the circumstances of this case, Sicari did not invoke his right to terminate police questioning by remaining silent for an interval of thirty to forty minutes after being confronted with evidence inconsistent with his prior statements to the police. We further hold that the semen evidence was properly admitted because it tended to prove that Sicari was physically present at the place where the victim was murdered, and the objections raised went to its weight rather than its admissibility. Accordingly, we affirm the convictions. After reviewing the full record, we also decline to exercise our power under G. L. c. 278, § 33E, to reduce the murder verdict in this heinous crime.

1. *Procedural history.* On December 11, 1997, Sicari and

---

[1]Charles Jaynes was tried and convicted on similar indictments. His appeal is pending in the Appeals Court.

Jaynes were indicted for murder in the first degree and kidnapping. Their cases were severed prior to trial. Sicari filed a motion to suppress incriminating statements he made to the Cambridge police, which was denied after a five-day evidentiary hearing. Sicari then filed a motion in limine to exclude evidence regarding semen found in the back seat of Jaynes's Fleetwood Cadillac automobile (the Fleetwood) where the murder occurred. That motion was also denied.

The case was tried in October and November, 1998, before a jury. The statements Sicari made, incriminating himself in the murder and the disposal of the victim's body, provided significant, but far from the only, evidence against him.

In the course of trial, the defendant again moved to exclude the semen evidence. In reconsidering her pretrial ruling, the trial judge held that the evidence was not admissible because the Commonwealth had not adequately linked the semen found in the back seat of the car to the murder that took place there, and excluded the testimony. The Commonwealth sought relief from a single justice of this court pursuant to G. L. c. 211, § 3, claiming that it would be unfairly prejudiced by the exclusion of the evidence because it relied on the judge's pretrial ruling and mentioned the evidence in its opening statement. The single justice did not rule on the merits of the question of admissibility, but concluded that no curative instruction could adequately undo the harm to the Commonwealth that would accrue if the evidence was excluded, and, in the event of a conviction, the defendant could argue that the admission of the evidence was prejudicial error. Accordingly, in balancing the interests of the parties, she reversed the trial judge's ruling excluding the evidence.

The jury returned verdicts of guilty of kidnapping and murder in the first degree by reason of extreme atrocity or cruelty.

2. *Facts.* We summarize the facts that the jury could have found, reserving details for discussion of the issues raised in this appeal. Sicari lived in the victim's East Cambridge neighborhood. He was twenty-one years old and a friend of Jaynes, twenty-five years of age, with whom he previously worked at an automobile dealership in Newton. Jaynes lived in Brockton and at the time of the murder rented an apartment in

Manchester, New Hampshire. There was evidence that he was a pedophile. Sicari and Jaynes had been "hanging out" together during the months leading up to October 1, 1997, and were often seen traveling around in Jaynes's Fleetwood. Through Sicari, Jaynes befriended the victim, and both defendants plotted to seduce him into engaging in sexual activity with one or both of them. This attempted seduction included ingratiating themselves by taking the victim to places in Jaynes's car, by purchasing a new bicycle to replace one that had recently been stolen, and by offering him fifty dollars.

On the afternoon of October 1, Sicari encountered the victim near his grandmother's house. Shortly afterward, Sicari met Jaynes by prearrangement and they went looking for the victim in the Fleetwood. When they approached the victim's grandmother's house, Sicari slipped down in his seat so that he would not be seen. This was the day they had told the victim that he would get his new bicycle and fifty dollars. The victim got into the Fleetwood at approximately 3:15 P.M. Shortly thereafter the car stopped at a Mobil gasoline station in Newton, where Jaynes soaked a cloth with gasoline and placed it on the floor in the front seat. At approximately 4:45 P.M., the Fleetwood was seen in the parking lot of an NHD hardware store, also in Newton. Sicari and Jaynes were visible in the front seat. There was no sign of the victim. Between these two stops, in the back seat of the Fleetwood, Jaynes forced the cloth soaked with gasoline over the victim's nose and mouth. The victim fought for his life, but ultimately succumbed to the poisonous fumes. In his statement to the police, Sicari described how Jaynes had killed the victim because "he thought he was going to get a bike and fifty dollars for nothing," and how the victim had struggled while Sicari drove the car and evaded a police cruiser in the vicinity.

After parking in the NHD lot, Jaynes went into the store and purchased duct tape and a large tarpaulin. Sicari and Jaynes then drove to the Honda Village in Newton (with the victim's body on the floor of the back seat) where Jaynes was scheduled to work. While Jaynes worked, Sicari wrapped the body in the tarpaulin and concealed it in the trunk. Later that evening, Jaynes and Sicari stopped at a Bradlees store in Watertown to

purchase a large Rubbermaid container, and traveled to the Home Depot store in Somerville to purchase bags of lime and concrete. That night, the two men drove to Jaynes's apartment in New Hampshire where they proceeded to entomb the victim's body in the Rubbermaid container, using the supplies they had purchased. Shortly after 5 A.M. on the morning of October 2, they threw the container into the Great Works River in South Berwick, Maine, and proceeded, without apparent guilt or remorse, to buy coffee and pastry for breakfast.[2]

On October 7, the container with the victim's body was located in the river. The medical examiner determined that the boy died from "gasoline poisoning . . . by inhalation," an agonizing death. His examination as to physical evidence of sexual abuse was inconclusive. Among other things, the crime scene investigators found semen on the kitchen floor of Jaynes's New Hampshire apartment, which DNA testing determined to be consistent with that of Jaynes,[3] and semen on the back seat of the Fleetwood, which was determined to be consistent with that of Sicari.

3. *Motion to suppress.* Sicari's pretrial motion to suppress statements he made to Cambridge police officers on October 2 and in the early morning hours of October 3 was initially grounded on claims that (1) the police had violated the rule set out in *Commonwealth* v. *Rosario*, 422 Mass. 48 (1996), by questioning him for more than six hours after taking him into custody without an arraignment; (2) the waivers of his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and *Commonwealth* v. *Rosario, supra*, were not made freely, intelligently, and voluntarily; and (3) his confession was involuntary because of his lack of sleep, the relentless questioning and pressure applied by the Cambridge police, and their refusal to honor his

---

[2]During the evening of October 1, Sicari spoke to his former girl friend on the telephone several times. He told her that he had hurt someone "really bad," and needed to get something done that night or there might be trouble. When it became clear to her that Sicari had killed someone, she got upset and asked whether he had any remorse for what he had done, to which he responded, "I could give two fucks. It's like a bowl of cereal to me: I could either eat it or walk away."

[3]Sicari told police that Jaynes sodomized the victim's lifeless body after they brought it to the New Hampshire apartment.

requests for counsel and to speak to his mother. However, over the course of the evidentiary hearing, Sicari raised an additional ground, specifically, that he had invoked his right to terminate police questioning at approximately 12:45 A.M. on October 3, by remaining silent for a period of time after police officers confronted him with evidence that he and Jaynes had purchased lime at the Home Depot store on the evening of October 1. On appeal, Sicari claims error on the last ground only.[4]

Sicari argues that the case presents two issues of first impression: first, whether a period of silence of this duration (thirty to forty minutes), in the face of police questioning, constitutes an "expressed unwillingness" to continue with the questioning, *Commonwealth* v. *Selby*, 420 Mass. 656, 662 (1995), such that all questioning should have ended; and second, if not a clear expression of unwillingness, whether Sicari's silence was sufficiently ambiguous, such that any further police questioning should have been confined to clarifying his intent. It is necessary to summarize the careful and extensive findings of the motion judge before turning to Sicari's legal claims.

In pertinent part (and in abbreviated form), the judge made the following findings regarding the statements Sicari made during four meetings he had with Cambridge police on October 2 and 3, 1997. Sicari seeks suppression of the last of these statements only. But the nature and progression of discussions between Sicari and the police, and the circumstances leading to his final statement, inform and provide important context to our decision.

a. *First meeting — October 2, 1997, morning.* On the morning of October 2, 1997, Sicari approached Sergeant Lester Sullivan of the Cambridge police at the victim's residence and volunteered that he had seen the victim at about 3 or 3:30 P.M. on October 1, the previous day, walking a dog in the area of

---

[4]Sicari also claims that the judge erred in finding that he did not *explicitly* tell police interviewers that he wanted to terminate the interview at 12:30 A.M. The judge's factual finding in this regard, which is discussed at note 6, *infra*, is fully supported by the record, and based in large measure on her evaluation of the weight and credibility of the testimony of a number of witnesses. We do not find any basis in the record on which to conclude that the judge's finding is in error on this point. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990).

Hampshire and Bristol Streets in Cambridge. They spoke for a few minutes, after which Sicari said the victim had entered a green house on Bristol Street, and Sicari had proceeded to walk to his own home on Market Street where he met Jaynes, and then went to the Boston Public Library.

Sicari gave a physical description of Jaynes to Sergeant Sullivan and added that in the preceding weeks he had observed Jaynes driving the victim around in Jaynes's Fleetwood, and that Jaynes had offered the victim a bicycle.

At the officer's request, Sicari tried to page Jaynes from Sullivan's car telephone and then from Sicari's home, but was unable to reach him. The conversation between Sicari and Sergeant Sullivan lasted about thirty minutes. During this time Sicari spoke eagerly and appeared cooperative. Sullivan thanked Sicari and told him that the police might need to contact him again.

b. *Second meeting — October 2, 1997, noon.* After Sullivan related this conversation to Sergeant Patrick Nagle of the Cambridge police, Nagle went to the victim's neighborhood to speak to Sicari himself. Sicari was in the street passing out flyers regarding the disappearance of the victim. Sicari repeated to Nagle what he had told Sullivan.

Sicari also told Nagle that he and Jaynes left the Boston Public Library at about 4:20 or 4:40 P.M. on October 1, and traveled to Honda Village in Newton where Jaynes worked cleaning cars, that they left Honda Village at about 8:25 P.M. to go to a liquor store in Newton Centre, and then drove to Jaynes's apartment in New Hampshire where they spent the night. Sicari believed the apartment was in a town with a name that sounded like "Mansfield"; and that Jaynes was living in New Hampshire because he had numerous warrants for "passing bad checks."

At the end of the conversation, Sicari gave Nagle his pager number if he wanted to reach him. The conversation lasted about forty minutes and concluded at 12:45 P.M. Sicari was "very enthusiastic," cooperative, and seemed concerned about the victim.

c. *Third meeting — October 2, 1997, afternoon.* Because the investigation was not making progress and Sicari was the last person who had seen the victim, Nagle paged Sicari at about

2:15 P.M. Sicari returned Nagle's page and told him that he would come to the police station to talk further, but did not have transportation. Nagle sent a car to collect him. He arrived at the station at about 3:10 P.M., still enthusiastic about trying to find the victim. A conversation ensued that was essentially a repetition of Nagle's earlier conversation with Sicari.

In addition, Sicari told Nagle that he had met Jaynes two years earlier in Brockton, and that they had started "hanging" together during the last couple of months. Sicari also mentioned that, after seeing the young victim in Jaynes's Fleetwood a couple of weeks earlier, he told the victim that he should not "hang out" with older men. Sicari also claimed to have told Jaynes that he should not "hang out" with younger boys; "it didn't look good." The talk ended at about 3:45 P.M., and Sicari said that the police could page him if they needed him further. Nagle paged Sicari later in the day but got no response.

d. *Fourth meeting — October 2, 1997, evening.* At about 5 P.M., Nagle received a call from the Newton police indicating that they had Jaynes under arrest for outstanding warrants. Nagle could hear commotion in the background, apparently resulting from Jaynes's arrest, and asked if "Sal Sicari" was at the station. He was.

Sicari took the telephone and Nagle said, "Sal, I thought you said you would get back to me if I beeped you." Sicari said that he had wanted to talk to Jaynes. Sicari agreed to return to the Cambridge police station to talk further, and Nagle sent a car to bring him there. The judge found that Sicari was not under arrest or in custody. He arrived back at the Cambridge police station at about 7 P.M. Nagle and Sicari went into a conference room where they were joined by Special Agent David Nadolski of the Federal Bureau of Investigation (FBI) and Cambridge police Detective Silverio Ferreira. Nagle interviewed Sicari from 7:15 to 9:30 P.M.

Although Sicari was not a suspect, Nagle thought it would be prudent to read Sicari the Miranda warnings. He began the interview by asking Sicari how far he had gone in school, and Sicari replied that he had left school in the twelfth grade. Nagle asked Sicari if he were under the influence of alcohol, drugs, or medication, and Sicari responded that he was not. Nagle then

read Sicari his Miranda rights from a card. Sicari responded that he understood each of his rights. Nagle then asked Sicari whether he wanted to talk to the police, and he said that he did. Nagle gave Sicari a Miranda rights form and asked Sicari to read the form to himself and be sure that he understood his rights. Sicari looked at the form, said that he understood it, and signed it at 7:25 P.M. The judge found Sicari's waiver of his right to remain silent to have been knowingly, voluntarily, and intelligently made beyond a reasonable doubt.

Sicari was asked a variety of questions about why he had gone to Newton that day with members of the victim's family (apparently to confront Jaynes), how well he knew Jaynes, and how to locate Jaynes's New Hampshire apartment. There was a break in the interview for cold drinks, and at about 8:45 P.M., Sicari telephoned his mother to tell her that he was fine, that he would be home soon, and that she need not come down to the station because he was just helping the police. Sicari also asked his mother to get something from another room. There was a pause in the conversation. Then Sicari asked Ferreira for a pen and Sicari wrote, "Anthony Scaccia, 1101 Elm Street, Apt. 206, Manchester, N.H." Sicari gave this paper to Ferreira and indicated that it contained a false name Jaynes used and the address of Jaynes's New Hampshire apartment.

At some point during the interview, Sicari was asked by Nadolski if he would agree to take an FBI administered polygraph test and Sicari indicated that he would, saying that he wanted to do anything he could to help. Up to this point, the interview had lasted about two hours, excluding the breaks. The tone of the entire interview was conversational. Sicari spoke calmly and coherently and his answers to the police questions were direct, logical, and clear. He had been free to leave at any time.

  e. *The polygraph test — October 2-3, 1997, 9:30 P.M. to 12:30 A.M.* Special Agent Thomas Donlan of the FBI administered the polygraph examination to Sicari. During the test, Donlan was alone in the conference room with Sicari. He explained to Sicari why he was there, and gave Sicari a form containing Miranda warnings and a consent form specifically for taking the polygraph. Sicari looked at each form for a few minutes. Both Sicari and Donlan then signed them at approximately 9:55 P.M.,

and the judge found that Sicari's waiver of his right to remain silent was again knowingly, voluntarily, and intelligently made beyond a reasonable doubt.

After background questions were asked, instruments were attached to Sicari and various charts were run and evaluated by Donlan. During the posttest interview, Sicari told Donlan that Jaynes was a pedophile, interested in young boys. Sicari also said that Jaynes had disappeared numerous times at his place of employment (the automobile dealership) the previous day, once for as long as thirty minutes. Sicari had followed him upstairs at the dealership and said that Jaynes had been angry because the victim had tried to "scam" Jaynes for the fifty dollars that Sicari said Jaynes was going to offer the victim for sexual favors.

As a result of the posttest interview, Donlan became concerned that the missing boy might be on the second floor of the dealership in Newton and Donlan did not know if the officers had explored that area. Donlan also believed that Sicari was at the point of providing more information and wanted other officers to hear any new details. Donlan stopped the interview and, at about 12:30 A.M., emerged from the room and told the officers seated outside that he thought "Sal" had something he wanted to tell Nagle.

f. *Sicari's confession — October 3, 1997, 12:30 to 3 A.M.* Nagle and Nadolski reentered the conference room at approximately 12:30 A.M. (now October 3). Donlan asked Sicari to relate to the other officers what Sicari had told him. Donlan then began to pack up his test equipment and prepare to leave.

Sicari appeared to be emotionally upset and began crying uncontrollably and gasping for air. Nagle told Sicari to relax but Sicari was jumping around and saying that he thought something bad had happened to the victim at the car dealership. Nagle asked Sicari what he meant by that, and Sicari said that Jaynes kept going upstairs. Nagle asked Sicari if the victim had been upstairs and Sicari said he did not know. Nagle asked if Jaynes went upstairs to use the telephone to call the victim and Sicari repeated that he did not know, that he just thought something bad had happened to the victim at the car dealership.

As Sicari's statements were not making sense, Nagle asked if

Sicari had been "straight" with him when they had spoken in the afternoon. Sicari replied affirmatively, to which Nagle responded, "Well, then why didn't you tell us about the bag of lime you bought last night at Home Depot?"[5]

On hearing this, Sicari stopped crying immediately, stood up with his hands clasped behind his back, an angry look on his face, and said in a loud, forceful voice: "Fuck it. Fuck it. Lock me up." Nagle replied, "What for? What should I lock you up for?" Sicari answered, "Fuck it. Lock me up. I fucked up." Nagle asked again what Sicari should be locked up for, how he had "fucked up." Sicari did not answer.[6]

Nagle left the interview room and was replaced a few minutes later at 12:45 A.M. by Cambridge Detective John Fulkerson and Massachusetts State Trooper Al Hunte. When they entered the interview room, Nadolski was there and Donlan was still packing up his equipment.

Fulkerson and Hunte found Sicari still standing up and looking out one of the windows. When they attempted to introduce themselves, Sicari blurted out the words, "Lock me up; I'm guilty; get my room ready." Obviously upset, Sicari loudly repeated some variety of that refrain about four times, without any further questioning by the police. Although Fulkerson was aware that Sicari had previously been given and waived his Miranda rights, he again advised Sicari of his rights from a Miranda card that he carried with him. After reading Sicari his

---

[5]While Sicari was undergoing the polygraph examination, Detective Fulkerson, who had interviewed Jaynes at the Newton police department, informed Nagle that a receipt from Home Depot for a bag of lime had been found in Jaynes's car.

[6]Donlan testified at the motion to suppress hearing that, at about this time, Sicari said that he did not want to answer any more questions. The judge found no such statement was made. Donlan was packing up his equipment when he purportedly heard this remark and was not participating in the interview. His role in the process (giving the polygraph examination) was completed and he was preparing to leave. Both Nagle and Nadolski (the only law enforcement officer present throughout the entire "confession" period, 12:30 to 3 A.M.), testified that Sicari did not make such a statement. Donlan also testified that he was not certain what Sicari had said but recalled that "for a period of time he wouldn't answer any more questions." The judge found it significant that Sicari himself did not state in his affidavit filed with his motion to suppress that he ever told the police that he did not want to answer any more questions.

rights, Fulkerson asked Sicari if he wanted to talk to the police. Sicari did not respond.

During the next twenty to thirty minutes, Fulkerson and Hunte asked Sicari about ten or twelve questions. Sicari did not answer any of them. One question was asked; there was a pause for several minutes; another question was asked, and it was followed by a further pause. These questions related to why Sicari had said he was guilty, what he was guilty of, and why he should be locked up. Only one question was posed at a time; when that was not answered, the officers considered how to phrase the next question and would then ask it.

The judge found that the tone of the questioning was calm and the officers treated Sicari courteously and with respect. At no time did Sicari explicitly refuse to answer the questions, request an attorney, or indicate that he did not want to talk to the police. He appeared to be deep in thought.

After this twenty to thirty minutes of thought, Sicari sat down, pulled his sweatshirt up over his nose and chin, and slouched into the chair. For another ten minutes, Fulkerson and Hunte asked Sicari what he was guilty of, why he should be locked up, and what was going on. The questions were still asked calmly, in a conversational manner. Sicari continued to appear to be thinking. Then at about 1:30 A.M., Sicari turned and looked at Fulkerson and said, "I'm guilty, but I didn't kill Jeffrey Curley. Charles Jaynes did."

Fulkerson asked Sicari to start at the beginning and tell the police what he knew. In narrative form, Sicari told the police about his and Jaynes's involvement with the victim on the preceding day. He presented an extremely specific, coherent account of the events of that day concerning the victim's disappearance.[7]

Sicari explained in excruciating detail how Jaynes lured the victim into his Fleetwood; drove him to Newton and killed him; then drove to New Hampshire and sexually assaulted the boy's body. Sicari also explained the purchase of a Rubbermaid

---

[7]The gruesome details of the statement are not recounted herein as they are unnecessary to the decision. It is the quantity of detail, its conformance to evidence later recovered by the police, and the manner in which it was delivered that the judge found relevant in ruling on the motion to suppress.

container and bags of lime and cement, how the body was placed in the container, and how he and Jaynes had disposed of it.

Sicari placed the blame on Jaynes for the killing of and sexual acts on the victim. The only point at which Sicari portrayed himself in an active role was in the disposition of the body. To the extent that it was possible, Sicari removed himself from the most heinous parts of the criminal acts on the boy.

During this narrative, there was very little questioning of Sicari. The police interrupted occasionally with questions to clarify some of the statements. Sicari was calm and relaxed during the statement, lucid, coherent, and consistent. He did not appear to be under the influence of any substance nor did he appear tired or drained. Sicari never asked for an attorney or to stop the interview.

Sicari spoke for a little over one hour, and the statement was concluded at about 3 A.M., at which point Sicari was arrested for the murder of the victim. The judge found that from the time Sicari became silent after stating, "Lock me up. I'm guilty," until the time he started to talk again, was a period of thirty to forty minutes. During this period, Sicari never indicated that he wished to exercise his right to remain silent or that he wanted an attorney. No coercion or pressure was exerted by the police. Sicari and the police remained in a conference room setting, with three officers present, two of whom were posing questions. The inquiries were not made in an overbearing manner and were each spaced several minutes apart. No promises or threats were made to Sicari at this or any other time.

The judge further found that, until Sicari was presented with the fact that the police knew about the bag of lime, he, from all outward appearances, had been successful in duping or misleading the police and diverting attention from himself. However, when confronted with the evidence of the purchase of the incriminating material, Sicari had to reconsider his plan and think about his further course of action. He did that during the thirty to forty minute period of silence, rethinking his strategy and deciding whether to confess, and if so, what portion of the blame he should assume. Thus, the judge concluded that the interval in which Sicari did not answer any questions was not

an assertion of his right to remain silent but rather a time during which he decided how he wished to proceed. He was in control and exercising his best judgment as to how to protect himself in the new situation. When he was finished thinking, he began to speak to the police again, placing as much criminal responsibility as possible on Jaynes.

Finally, the judge found that Sicari was no stranger to police stations, Miranda rights, and the assertion of the right to remain silent, having been arrested on a number of previous occasions, in Brockton on September 9, 1996, and December 8, 1996; and in Cambridge on May 2, 1994. On each of these occasions he was informed of his Miranda rights, and on each occasion he had availed himself of the right to remain silent, and declined to speak to the police.

It is not disputed that Sicari was fully informed about and cognizant of his right to remain silent and to decline to speak to the officers who were interviewing him during the evening and early morning hours of October 2 and 3, 1997. Nor is it contested here that he voluntarily, knowingly, and intelligently waived that right, twice in writing, during the course of his fourth meeting with police at the Cambridge police station. The question presented is whether Sicari's waiver remained in effect when he confessed to his involvement in the killing of the victim, after thirty to forty minutes of silence during which he did not answer the officers' questions.[8,9]

The law is clear that an individual may assert his right to

[8]Not at issue in this appeal are the statements made to Nagle and Nadolski at approximately 12:30 A.M. (i.e., "Fuck it. Lock me up"), and the statements made a few minutes later to Fulkerson, Hunte, and Nadolski (i.e., "Lock me up. I'm guilty"). Each of these statements was made *before* Sicari's prolonged silence, and the latter statement was not prompted by police questioning.

[9]Sicari executed two waivers on the night of October 2. The narrative began about three and one-half hours after the second waiver, well within the permissible period for a Miranda waiver to retain its effectiveness. See *Commonwealth* v. *Fryar*, 414 Mass. 732, 741-742 (1993), *S.C.*, 425 Mass. 237, cert. denied, 522 U.S. 1033 (1997) (Miranda waiver valid even though defendant arrested at 2 A.M. and gave incriminating statements at 6:30 and 10:30 A.M.; court relied on defendant's signing of waiver form and rational and coherent appearance); *Commonwealth* v. *Silva*, 388 Mass. 495, 502 (1983) (three-hour lapse did not negate waiver); *Commonwealth* v. *Cruz*, 373 Mass. 676 (1977) (three and one-half hours between waiver and statement did not render waiver invalid).

remain silent and terminate police questioning at any time prior
to or during an interview, even after waiving that right. *Miranda*
v. *Arizona*, 384 U.S. 436, 473, 474 (1966). Once the right to
remain silent has been asserted, it must be scrupulously honored.
*Michigan* v. *Mosley*, 423 U.S. 96, 103 (1975). But, "[i]f a
defendant who has initially waived his right to remain silent
wishes later to cut off questioning . . . he must 'indicat[e] in
[some] manner' that he is invoking the right he previously
waived." *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 265
(1982), quoting *Miranda* v. *Arizona, supra* at 473-474. "For the
rule of Miranda regarding the termination of questions to apply,
there must be either an expressed unwillingness to continue or
an affirmative request for an attorney." *Commonwealth* v. *Selby*,
420 Mass. 656, 662 (1995), quoting *Commonwealth* v. *Roberts*,
407 Mass. 731, 734 (1990).[10] The critical issue for decision then
is whether Sicari's silence in the circumstances of this case was
an "expressed unwillingness" to continue the interview.

The motion judge concluded that the period of silence was
not an expressed unwillingness to continue the questioning, but
rather "a time used by Sicari to redevelop his strategy and
decide how he wished to respond to the discovery of the receipt
for the bag of lime." In essence, Sicari asks that we either set
aside this factual finding, or hold as a matter of law that a
period of silence of this duration, occurring in the middle of a
police interview, is either an invocation of the right to remain
silent or an ambiguous attempt to do the same which can only
be followed by questioning limited to clarifying the defendant's
intention.

On review of a motion to suppress, we do not disturb the
judge's findings of fact unless they are clearly erroneous. *Com-
monwealth* v. *James*, 427 Mass. 312, 314 (1998), and accord
deference to the judge's legal conclusions, "but independently
review[] the correctness of the judge's application of constitu-

---

[10]Sicari contends that his incriminating statements were obtained in viola-
tion of both his rights under the Fifth Amendment to the United States
Constitution (as applied to the States by the Fourteenth Amendment) and his
art. 12 rights guaranteed by the Massachusetts Constitution. "In the cognate
areas of rights under the *Miranda* decision and its progeny, we have been
content to interpret art. 12 as the Supreme Court has interpreted the Fifth
Amendment . . . ." *Commonwealth* v. *Rainwater*, 425 Mass. 540, 554 (1997).

tional principles to the facts found." *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996), quoting *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995). The judge's finding that Sicari's silence was a vehicle for thought and not an invocation of his right to remain silent has substantial support. Sicari appeared to be comfortable in his dealings with the police, and sought their attention. His day-long series of voluntary interactions with the police established that he was making concerted efforts to misdirect the investigation away from himself. The questioning immediately before his silence suggests that he was increasingly aware that his orchestrated attempt to shield himself from blame was unraveling and that he needed to reevaluate his strategy in light of the evidence the police might be accumulating against him. His demeanor during the period of silence, combined with the formulated narrative that he gave to police once he was ready to talk again, pointing the finger of the blame squarely at Jaynes and minimizing his role in the crime, further support the judge's finding. In light of all the evidence before the motion judge and her careful weighing and analysis of it, we cannot say that her determination was clearly erroneous.[11] *Commonwealth* v. *James*, *supra* at 314-315 (finding that when defendant said, "Nope," he meant he was not ready to give a formal statement, not that he was unwilling to answer questions, not clearly erroneous).

In the alternative, and irrespective of Sicari's actual intention, the judge found that Sicari's silence fell short of what is required to constitute an "expressed unwillingness" to continue the questioning as a matter of law. We have not previously considered whether silence, without more, by a suspect who has received Miranda warnings and initially responded to police questioning, mandates the termination of that questioning.

Courts that have considered this issue have differed in their conclusions. Some courts have held that silence alone is not a

[11]Sicari's affidavit filed in support of his motion to suppress makes no mention of this period of silence or of any attempt on his part to end police questioning by refusing to answer questions. The lack of such an assertion suggests that his present position was formulated during the hearing on the motion to suppress, and not reflective of his intentions at the time of the police questioning, further supporting the motion judge's findings in this regard.

sufficient expression of the right to remain silent. See, e.g., *People v. Cooper*, 731 P.2d 781, 782, 784 (Colo. Ct. App. 1986) (defendant's silence throughout one and one-half hours of questioning, after signing of waiver, was not indication of desire to curb questioning); *State v. Perkins*, 219 Neb. 491, 494-496 (1985) (after waiving right to remain silent, two periods totaling over two hours of silence in face of questioning was not indication that defendant wished to end questioning, where he subsequently asked for and confessed to specific police officer). Courts that have decided the issue in a contrary manner have done so in circumstances largely distinguishable from this case, either because a suspect never answered any questions over an extended period of time, or because a suspect did not indicate that he understood his right to remain silent in the first instance. See, e.g., *United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992) (defendant's silence in face of *all* questioning, including booking questions, was sufficient to invoke right to remain silent); *State v. Flower*, 161 Ariz. 283, 286 (1989) (defendant's silence to question whether he understood Miranda rights, and to questions during police interrogations, requires police to discontinue interrogation or seek clarification whether defendant wished to continue); *Watson v. State*, 762 S.W.2d 591, 599 (Tex. Crim. App. 1988) (defendant invoked right to silence by refusing to answer any questions during two interrogations and part of third).[12]

Each case turns, as it must, on the specific facts. We see no reason to disturb the judge's finding that Sicari's thirty- to forty-minute period of silence, in the middle of a lengthy interview,

---

[12]This court has also considered situations somewhat analogous to the present one. In *Commonwealth v. Raymond*, 424 Mass. 382 (1997), the defendant initially denied involvement in the crime and then crossed his arms and was silent, shaking his head in response to police questions. We held that "[t]hese responses did not invoke Raymond's right to remain silent, thus obligating the officers to cease their questioning. . . . Rather, the implication of the head shaking is that Raymond wanted to deny the allegations. The fact that he did not respond orally could be attributed to nervousness or a desire to think through his answer before he spoke." *Id.* at 394. See *Commonwealth v. Roberts*, 407 Mass. 731, 733-734 (1990) (defendant made statement, then refused to answer some questions, but responded to later questions; court accepted judge's finding that conduct indicated an understanding by defendant of rights, not a desire to stop questioning).

and after two written waivers, was neither an invocation of his right to remain silent, requiring the termination of police questioning, nor an unambiguous request limiting further police questioning to clarifying the defendant's intention.[13] The police questioning was not required to cease, and subsequent statements made by Sicari were admissible against him.

4. *Admission of the semen evidence.* Sicari contends that it was prejudicial error for the single justice to order the admission in evidence of testimony regarding a semen stain taken from the back seat of Jaynes's Fleetwood, which was found to be consistent with Sicari's DNA. That evidence came from a crime scene investigator who testified that she cut the fabric

---

[13] In *Davis* v. *United States*, 512 U.S. 452, 461-462 (1994), in the context of whether the questioning of a suspect should have been discontinued when he made an ambiguous request for counsel, the Supreme Court held that, "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him," or any obligation to ask clarifying questions. In the course of its decision, the Court adopted what has become called the "clear articulation rule." Following this decision, most circuits of the United States Court of Appeals and State Supreme Courts that have considered the question have adopted the "clear articulation rule" with regard to the assertion of the right to remain silent as well as the right to request counsel. See *Simmons* v. *Bowersox*, 235 F.3d 1124, 1131 (8th Cir. 2001); *United States* v. *Hurst*, 228 F.3d 751, 759-760 (6th Cir. 2000); *Tam Bui* v. *DiPaolo*, 170 F.3d 232, 239 (1st Cir. 1999), cert. denied, 529 U.S. 1086 (2000); *United States* v. *Banks*, 78 F.3d 1190, 1197 (7th Cir.), vacated on other grounds sub nom. *Mills* v. *United States*, 519 U.S. 990 (1996); *Medina* v. *Singletary*, 59 F.3d 1095, 1100 (11th Cir. 1995), cert. denied, 517 U.S. 1247 (1996); *People* v. *Arroya*, 988 P.2d 1124, 1131 (Colo. 1999); *State* v. *Owen*, 696 So. 2d 715, 718 (Fla.), cert. denied, 522 U.S. 1002 (1997); *State* v. *Williams*, 535 N.W.2d 277, 285 (Minn. 1995). But see *State* v. *Holloway*, 760 A.2d 223, 228 (Me. 2000) (declining to extend the holding in *Davis* to require unambiguous invocation of right to remain silent in the absence of a prior waiver). Those courts have held that unless a suspect "clearly and unambiguously" invokes his right to remain silent, either before or after a waiver of that right, the police are not required to cease questioning. A clear and unambiguous invocation of a suspect's rights is one which is articulated "with sufficient clarity so that a reasonable police officer would understand [the] statement to be an assertion of the right to remain silent." *United States* v. *Mikell*, 102 F.3d 470, 476 (11th Cir. 1996), cert. denied sub nom. *Young* v. *United States*, 520 U.S. 1181 (1997). If the suspect's articulation fails this "objective test," the police have no duty to stop questioning or to clarify the suspect's intent. *Id.* at 475.

If applied to the facts of this case, Sicari's period of silence would not meet the "clear and unambiguous" standard. However, for purposes of this case, we need not decide whether to adopt the "clear articulation rule."

containing the stain from the automobile's upholstery, and a DNA expert who testified as to the level of the semen's consistency with Sicari's DNA. The basis of Sicari's challenge is twofold: first, the evidence was not admissible because the semen was never connected to the murder with which he was charged; and second, its prejudicial effect far outweighed any probative value because it suggested "inappropriate" sexual behavior on Sicari's part (with the victim or otherwise) for which he had not been charged.

Before the trial commenced, the judge ruled that this evidence would be admissible. She then amended her ruling during the trial. The Commonwealth sought relief and a single justice ordered the evidence admitted, but did not reach the merits of the evidentiary issue; her ruling explained that Sicari could object to the admission of the evidence and have the issue considered on appeal. While the procedural posture might be unusual, the issue that we must decide is not.[14] Was the evidence relevant and, if so, was its admission nevertheless unfairly prejudicial? If the evidence should not have been admitted on either account, was it harmful to the defendant's right to a fair trial when viewed in the context of the totality of the evidence presented to the jury — in other words, might it have affected the outcome of the trial?

Evidence is relevant if it has a "rational tendency to prove an issue in the case," *Commonwealth* v. *LaCorte*, 373 Mass. 700, 702 (1977), or render a "desired inference more probable than it would be without [the evidence]." *Commonwealth* v. *Fayerweather*, 406 Mass. 78, 83 (1989). It "need not establish directly the proposition sought; it must only provide a link in the chain of proof." *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 744

---

[14]While Sicari's challenge is properly directed at the single justice's ordering the evidence admitted, the basis of his claim is that the evidence was not adequately linked to the charged offense (and therefore not admissible) and that its admission was highly prejudicial. Decisions of a single justice on petitions for relief filed pursuant to G. L. c. 211, § 3, "will not be disturbed on appeal absent clear error of law or abuse of discretion." *Fogarty* v. *Commonwealth*, 406 Mass. 103, 106 (1989). However we might rule on the question whether the single justice committed a clear error of law or abused her discretion, we would have to decide the underlying merits of the evidentiary question, which would, in any event, determine the outcome of this issue. Therefore, we proceed directly to the merits of the evidentiary claim.

(1990), quoting *Commonwealth* v. *Tobin*, 392 Mass. 604, 613 (1984).

The extent to which Sicari participated in the actual killing of the victim, which took place in the back seat of Jaynes's Fleetwood, was certainly a material issue at trial. Evidence placing Sicari at the scene of the murder tends to prove that he participated in it.[15] Semen is no different from fingerprints, hair follicles, or blood in its utility for this purpose. Such evidence connects him with the place, which in turn connects him to the crime that occurred there. See *Commonwealth* v. *Morris*, 422 Mass. 254, 257 (1996) (defendant's thumbprint on plastic mask left at scene coupled with other evidence rationally links defendant to crime); *Commonwealth* v. *Drayton*, 386 Mass. 39, 48 (1982) (defendant's fingerprints found on box at scene of incident involving murder tend to prove identity of defendant as killer). The semen evidence was therefore relevant. *Commonwealth* v. *LaCorte*, *supra* at 702 (fingerprints found in victim's apartment immediately after homicide have some tendency to prove identity of killer).

Evidence of Sicari's presence at the crime scene does not prove he committed the murder, nor does it prove that he was at that scene when the murder occurred. But that is not the test of admissibility. Those are subjects for cross-examination that bear on the weight of the evidence. The probative value of the evidence is for the jury to decide after listening to cross-examination and the closing arguments of counsel. *Commonwealth* v. *Yesilciman*, *supra* at 744-745 (inability to link blood on defendant scientifically with blood at scene to prove his presence at scene goes to weight of evidence, not its admissibility); *Commonwealth* v. *LaCorte*, *supra* (when defendant's fingerprint was placed on cup found at scene of crime goes only to weight of evidence, not its admissibility).

Because the semen evidence was relevant, it was admissible unless it was unfairly prejudicial when weighed against its

---

[15]Sicari contended in his statements to police that he was only in the front seat and not in the back seat where the murder occurred. Consistent with this contention, his counsel thoroughly questioned the Commonwealth's witnesses at trial on their failure to find Sicari's fingerprints in the back seat area of the Fleetwood.

probative value. In weighing the probative value of evidence against any prejudicial effect it might have on a jury, we afford trial judges great latitude and discretion, and we uphold a judge's decision in this area unless it is palpably wrong. See *Commonwealth* v. *Lewin (No. 2)*, 407 Mass. 629, 631 (1990), and cases cited. In this case, the evidence was admitted, and we need only assess whether it unfairly prejudiced the defendant such that he did not receive a fair trial. It did not.

The evidence was of limited significance at the trial. On cross-examination, the Commonwealth's witnesses testified that they could not determine when or how the semen appeared on the back seat. Other evidence placed Sicari in the Fleetwood on multiple occasions prior to the murder when the semen could have been left. And on cross-examination, the Commonwealth's DNA expert testified that the level of consistency between Sicari's DNA and the semen was not very significant.[16] More importantly, the Commonwealth made only brief and noninflamatory mentions of the evidence in its closing argument for the purpose of placing Sicari in the back seat of the Fleetwood.

In contrast, the evidence of Sicari's guilt, apart from the semen evidence, was overwhelming, including a detailed confession and statements made to a friend on the night of the murder. In these circumstances, we are convinced that the admission of the semen evidence, even if it had been ruled more prejudicial than probative,[17] "did not influence the jury, or had but very slight effect," *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983), and did not result in an unfair trial.

5. *General Laws c. 278, § 33E, relief.* Sicari asks this court to exercise its power under G. L. c. 278, § 33E, to reduce the verdict to murder in the second degree to be more consonant with justice. He points to Jaynes's conviction of murder in the

---

[16]The expert testified that the types of genetic markers found in the semen would be found in one in 5,800 Caucasians, one in 14,000 African-Americans, and one in 15,000 Hispanics.

[17]While Sicari contends that the judge ruled that "any probative value [of the semen evidence] is far outweighed by [its] prejudicial effect," the record is not so clear. The judge specifically stated that she was not basing her ruling (excluding the evidence) on such a finding but merely noted that she probably could have based it on such a conclusion.

second degree in a separate trial, in spite of what Sicari contends is Jaynes's greater level of culpability; and to his cooperation with authorities and his assistance in finding the victim's body, as contrasted with Jaynes's failure to cooperate with the police. We decline to do so.

The murder of this young boy was atrocious. The fact of a different outcome in a codefendant's trial does not change the heinous nature of the crime. See *Commonwealth* v. *Mello*, 420 Mass. 395, 397 (1995); *Commonwealth* v. *Valentin*, 420 Mass. 362, 375 (1995), and cases cited. Sicari's cooperation with the police and his assistance were facts that the jury heard, and could have provided them with the basis for a different view of the level of Sicari's involvement in the underlying crime. It did not. We see no reason to do otherwise.

*Judgments affirmed.*