## COMMONWEALTH *vs.* JAMES M. BONDS.

No. 04-P-111.

Plymouth. December 7, 2004. - March 11, 2005.

Present: ARMSTRONG, C.J., BROWN, & BERRY, JJ.

Further appellate review granted, 444 Mass. 1103 (2005).

*Rape. Evidence,* Relevancy and materiality.

At a rape trial, the judge improperly allowed in evidence testimony that aspects of the complainant's limited mental capacity included the tendency to trust naively those whom she did not know, where the evidence was, in the circumstances, only tangentially probative of whether the complainant consented to intercourse, the only real contested issue at trial; where the evidence impermissibly suggested the complainant's predisposition to be victimized; where the evidence injected collateral matters into the trial that could not have been anticipated by the defendant, and which he was almost certainly unprepared to rebut; and where the evidence held a strong potential to elicit undue sympathy for the complainant. [166-170]

INDICTMENT found and returned in the Superior Court Department on May 22, 2000.

The case was tried before *Mitchell J. Sikora,* J.

*Eric S. Brandt,* Committee for Public Counsel Services, for the defendant.

*Therese M. Wright,* Assistant District Attorney, for the Commonwealth.

BROWN, J. After a jury trial in the Superior Court, the defendant was convicted of rape. On appeal, the defendant claims that the judge improperly allowed in evidence unduly prejudicial testimony that aspects of the complainant's limited mental capacity included the tendency to trust naively those whom she did not know. Accordingly, the defendant contends that that evidence impermissibly suggested the complainant's propensity to be victimized.

The jury could have found the following facts. On February 15, 2000, Stephanie Hoch visited the complainant at her home.

At that time, the complainant was nineteen years old and lived with her mother and father. She had graduated from Brockton High School in 1999, where she had been a special needs student. After high school she worked at various jobs, but she was not working at the time of the trial and was receiving Supplemental Security Income benefits, which were available to her because of her mental disabilities.

Hoch was an acquaintance of the complainant, with whom she talked frequently on the phone. While Hoch was at the complainant's home, she used the complainant's telephone to call the defendant. When she was on the telephone, she told the complainant that the defendant wanted to speak to her. The defendant told the complainant that he wanted to "mess around with [her]," which the complainant interpreted to mean that he wanted to have sex with her. The complainant also testified that the defendant said he "wanted to fuck [her]." The complainant said no and that she was "only going to hang out there with just a friend" and got off the phone with him.

In order to convince the complainant to accompany her to visit the defendant at his boarding house, Hoch promised the complainant that she would protect her and that "she was going to make sure nothing was going to happen to [her]." Because the complainant "trusted her," she agreed to go with Hoch. Upon their arrival, the defendant opened the door to the boarding house and brought the two women into his sparsely furnished single room. The complainant had never met or spoken to the defendant prior to this day.

The defendant began to talk to the complainant, while Hoch sat on the floor and watched television. The defendant asked the complainant if she remembered "talking shit on the phone." When the complainant looked at the door, the defendant locked it, and then grabbed her by the arms and pushed her onto the bed. Despite the complainant's repeated protestations, the defendant took off the complainant's pants and underpants. She continued to tell the defendant "no," but the defendant said he "was going to do it anyways," and he put his fingers into her vagina. When the defendant told the complainant he was going to put his penis inside her, she told him to put on a condom. The complainant hoped that she could escape in the time it took

the defendant to obtain a condom, but because he had one in his pocket, she was unable to flee. After he put the condom on, the defendant inserted his penis into the complainant's vagina. The complainant testified that she was scared and that she felt like she had no choice. The complainant told the defendant to stop many times, but he did not do so until about ten minutes had passed. Throughout the incident, Hoch sat on the floor in the defendant's room and watched television.

Immediately after the incident, the complainant put on her clothes and took the defendant's telephone into the hallway of the boarding house and called Rob Archer, the man she was dating. She told him she had been raped. The defendant came out into the hallway, grabbed the telephone, and went back inside his room, slamming the door in the complainant's face as he did so. The complainant left and walked directly to the police station, which was only a short distance from the boarding house. Hoch accompanied her.

At the station, the complainant told police that she had been raped; she was then taken to Brockton Hospital, where she repeated to hospital personnel what had happened to her. The subsequent examination and collection of evidence in the rape kit were treated by the parties as having revealed no significant physical findings.[1] The complainant also called her mother from the hospital and told her that she had been raped. Brockton police Officer Stanley David and the complainant's mother testified as fresh complaint witnesses for the Commonwealth.

The defense theory was one of consent. According to the defendant, who testified at trial, the complainant had been the one who initiated the telephone conversation about sexual intercourse, and she had been the one who initiated the sexual activity at the defendant's apartment. Stephanie Hoch also testified for the defense and corroborated the defendant's version of events.

In rebuttal, the Commonwealth called Officer David and the

---

[1] The examination of her genitalia, however, "revealed a small fissure in the perineal region at 6 o'clock below the introitus. There is no open laceration or bleeding noted, no bruising is noted. The patient was unable to allow completion of the vaginal exam with the speculum as she stated she had too much pain and could not go through with it." The relevance of this finding is unclear, as it was not developed at trial.

complainant's mother, both of whom had talked to Hoch on the day of the incident. Officer David testified that he had interviewed Hoch at the police station when she arrived with the complainant. She told Officer David that when the defendant opened the door to his room, he grabbed the complainant by her arms and threw her on the mattress. Hoch told him that the defendant removed the complainant's pants and underwear and that she "witnessed the rape occur." The complainant's mother testified that she had twice spoken to Hoch shortly after the incident. Hoch gave the complainant's mother the defendant's name and his place of employment, but told her that she would not testify because the defendant had threatened her.

The defendant argues that the judge erred in admitting, over objection, testimony from the complainant's mother about the overly trusting nature of the complainant, along with specific examples of prior instances illustrating this characteristic.[2]

According to the defendant, the testimony was impermissible

---

[2]Relevant portions of the examination at issue are set forth below.

Q. "And as a result of the intellectual deficiencies, can you describe for the jury how that manifests itself in terms of how she relates to other people, friends, peers, that sort of thing?"

". . .

Q. "Relative to how [the complainant] relates to what she characterizes as friends and her judgment and trust in people, could you explain that to the ladies and gentlemen of the jury?"

A. "She clung on to people thinking they were her friends. She trusted them too quickly. She always called everybody her friend because she doesn't understand the difference between acquaintances and friends. She held on to that so she could have, you know, her friends."

Q. "So she — would it be fair to say that she would characterize someone as a friend after one meeting?"

A. "Correct."

Q. "And relative to her trusting people, did that cause her problems in terms of was she victimized as a result of that?"

A. "Absolutely." [Objection sustained.]

Q. "If you could, . . . could you tell us what types of things happened between [the complainant] and the people she believed to be her friends?"

character evidence that invited the improper inference that the complainant, being overly trusting, had a propensity to be victimized. In response, the Commonwealth contends that the evidence was not character evidence, but rather proof of the complainant's ongoing mental and emotional incapacity resulting from problems related to brain functioning that began at an early age. The Commonwealth also asserts, as it argued at trial, that the evidence was relevant to show why the complainant went to the defendant's boarding house, despite his explicit prior sexual advances to her on the phone.

The difficulty with the Commonwealth's argument is that the reason the complainant went to the defendant's home was, at best, only indirectly relevant to whether the complainant consented to the intercourse, the only live issue at trial. While the entire sequence of events concerning the rape is certainly relevant to a determination whether the intercourse was without the complainant's consent, the focus of the inquiry must be on

---

" . . .

Q. "And could you describe the instances that you personally observed?"

A. "I observed her friends stealing from her because before they left the home. When [the complainant] found that they stole, I retrieved it from them. And another instance which was right around the end, right after she graduated from high school three girls came into my home whom I had never seen before and asked her to go down to a certain girl's house on the same street we lived on."

Q. "She went?"

A. "She went with them. She did not know them either. But she knew the girl in question who they were going to see. And I was cleaning and had the windows open and heard yelling and screaming, and I ran outside to find my daughter being beat upon by five girls. We had charges pressed against them. But, there was a cop jogging down the street because there was five different law enforcement officers on the street, and one of them was jogging and stopped the beating. And I did witness that."

Q. "And would it be fair to characterize [the complainant] as lacking in the vernacular street smarts?"

DEFENSE COUNSEL: "I'm going to object."

THE COURT: "I'll sustain the objection to the question in that form."

*the time of the act.* See, e.g., *Commonwealth* v. *White*, 27 Mass. App. Ct. 789, 796 (1989). Here, the objected-to evidence only related to the complainant's state of mind as she approached the defendant's rooming house and as such is only tangentially probative of whether she consented to intercourse once inside the defendant's room.

Apart from its general lack of probity, there are other serious defects in the mother's testimony. In Massachusetts, as elsewhere, evidence of character, custom, or propensity may not be used to prove that a person acted in conformity with those forms of predisposition on any particular occasion. In the criminal sphere, this prohibition is usually invoked to bar evidence that a defendant was more likely to commit the crime charged either because he has a bad character in general or because he previously committed specific similar acts. See, e.g., *Commonwealth* v. *Daley*, 439 Mass. 558, 563 (2003). The notion is that presenting such evidence would pose a due process danger to the extent that it might encourage the fact finder to convict on the basis of evidence extrinsic to the event actually at issue.

While excluding predisposition evidence relating to the defendant is the common case, such evidence is, in fact, generally inadmissible (that is, with respect to any person), at least where it poses due process concerns. Here, for example, the mother's extensive testimony regarding the complainant's predisposition to be victimized might have impermissibly encouraged the jury to infer that she was also likely to have been victimized by the defendant here, irrespective of whether there was actually sufficient evidence to prove that a rape occurred. Thus the danger posed in a case like this — essentially the possibility that gaps in the prosecution's case might have been filled by speculative evidence of the complainant's predisposition to be victimized — is precisely the same as the problem created where propensity evidence is introduced with respect to a criminal defendant.

Recognizing the broad sweep of the limits on evidence of predisposition, this court in *Commonwealth* v. *Mandell*, 29 Mass. App. Ct. 504, 507 (1990), deemed inadmissible evidence relating to the fact that the victim in a motor vehicle homicide

case was sometimes "accident prone." As the court observed, "the testimony aimed at showing the victim's supposed habitual behavior . . . encountered the general rule in this jurisdiction that habit is not admissible as a means of proving the commission of a particular act." *Id.* at 508. As in *Mandell*, the predisposition evidence relating to the complainant here should not have been admitted to support the inference that she was likely to have been victimized by the defendant. Such evidence merely served to distract the jury from their duty to determine the defendant's guilt based solely on the evidence relating to the crime charged.

Even if the mother's testimony did not raise serious due process concerns, the evidence would be improper in any event. In Massachusetts, even where predisposition evidence is admissible, it may never be proved by means of specific, illustrative examples. Rather, at least in a criminal case, evidence of predisposition may be offered only in the form of reputation. See *Commonwealth* v. *Roberts*, 378 Mass. 116, 129 (1979).

Here, the mother's statements concerning the complainant's "overly trusting" nature, combined with the specific examples (e.g., victimization by friends and acquaintances) she gave of this aspect of the complainant's personality, conveyed to the jury that the complainant had a propensity to be victimized, and therefore, it was likely that she was victimized on the occasion in question. See *Commonwealth* v. *Mandell*, 29 Mass. App. Ct. at 507. Moreover, as with all evidence of this type, the use of these specific examples posed an additional danger, in that it injected collateral matters into the trial that could not have been anticipated by the defendant, and which he was almost certainly unprepared to rebut. See *Miller* v. *Curtis*, 158 Mass. 127, 131 (1893). See also Liacos, Brodin, & Avery, Massachusetts Evidence § 4.4.4 (7th ed. 1999). This form of evidence is simply not permitted, and should have been excluded.

Finally, there is yet another difficulty posed by the mother's predisposition evidence. Filled as it was with graphic examples of situations in which the complainant had been mistreated and abused by others, the mother's testimony held strong potential to elicit undue sympathy for the complainant. See *Commonwealth* v. *Lodge*, 431 Mass. 461, 470 (2000). While evidence that may tend

to evoke sympathy on the part of the fact finder is by no means inadmissible per se, it must be received with caution, and always tested against its probative value. See and compare *Commonwealth* v. *Filos*, 420 Mass. 348, 357 (1995). See also *Commonwealth* v. *DeLong*, 60 Mass. App. Ct. 528, 540-541 (2004) (Berry, J., dissenting). A trial judge has broad discretion to admit such evidence if probative of a legitimately contested point.

Here, however, the only real contested point was consent. The mother's testimony concerning these ancillary events had absolutely no probative value with respect to this crucial issue. As noted already, the mother's testimony could not have been admitted to suggest that the victim frequently exercised bad judgment in acquiescing to the demands of friends and so was more likely to acquiesce to the defendant's overtures here. Such propensity evidence is wholly improper. In these circumstances, we think the inflammatory potential prejudice of the mother's testimony far outweighed its probative value. The admission of the mother's testimony was error.

It remains to be determined, however, whether "the error possibly weakened [the defendant's] case is some significant way." *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983) (prejudicial error standard applicable where, as here, a timely objection was made). Here, as this case comes down to a "classic duel of credibility" between the rape complainant and the defendant, we are of opinion that the introduction of the evidence in question could have played a significant role in the assessment of the complainant's credibility, "mak[ing] plausible an inference that the result might have been otherwise but for the error." *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986).

*Judgment reversed.*

*Verdict set aside.*