## COMMONWEALTH *vs.* JAMES M. BONDS.

Plymouth. November 9, 2005. - January 19, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* Objections, Argument by prosecutor. *Evidence,* Relevancy and materiality. *Mental Impairment.*

At the trial of an indictment charging the defendant with rape of a woman suffering from a brain disorder and resulting mental disability, the judge properly admitted in evidence testimony by the victim's mother as to the victim being overly trusting, where such testimony was not inadmissible character evidence, but rather evidence of the manifestations of the victim's disability (a permanent condition), and was highly relevant to the issue of consent [827-833]; further, the trial judge did not err in admitting in evidence the mother's testimony recounting specific prior instances illustrating the victim's overly trusting nature, where the prejudicial effect of this evidence did not substantially outweigh its probative value, and where the judge forcefully instructed the jury on the issue of prejudice and on the need to confine their deliberations and decision to the evidence [833-835]; finally, the prosecutor's singular brief reference in closing argument to the victim's prior victimization did not create a substantial risk of a miscarriage of justice [835-836].

INDICTMENT found and returned in the Superior Court Department on May 22, 2000.

The case was tried before *Mitchell J. Sikora,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Therese M. Wright,* Assistant District Attorney, for the Commonwealth.

*Eric S. Brandt,* Committee for Public Counsel Services, for the defendant.

CORDY, J. On November 25, 2002, a jury convicted the defendant, James M. Bonds, of raping a nineteen year old woman (whom we shall call Ellen) suffering from a brain disorder and resulting mental disability. The Appeals Court set aside the jury's verdict, *Commonwealth* v. *Bonds,* 63 Mass.

App. Ct. 163 (2005), holding that the trial judge had improperly admitted character evidence of the victim's trusting nature and propensity to be victimized, through the testimony of her mother. We granted the Commonwealth's application for further appellate review. Because we conclude that the evidence admitted was not character evidence, but evidence of the manifestations of the victim's disability, and was highly relevant to an issue in the case, we affirm the conviction.

1. *Background.* The following evidence was introduced at trial. On February 15, 2000, Stephanie Hoch, an acquaintance, visited Ellen at her home in Brockton. Immediately on her arrival, Hoch telephoned the defendant, a thirty year old man whom Ellen did not know, and spoke to him privately. At some point, Hoch gave Ellen the telephone in order to speak with the defendant. The testimony regarding what was said during that telephone conversation and thereafter was conflicting. According to Ellen, the defendant told her that "he wanted to fuck [her],"[1] that she said "no," and that she told the defendant she and Hoch were only going to his residence to "hang out." The

---

[1] On direct examination, the following colloquy occurred:

THE PROSECUTOR: "And did you get on the phone?"

ELLEN: "I got on the phone, and he said he wanted to mess around with me, and I said no. I'm only going to hang out there with just a friend."

THE PROSECUTOR: "When you say mess around, what do you mean by that?"

ELLEN: "He wanted to have sex with me. I said no. And then when I got off the phone with him Stephanie said that she'd protect me and she was going to make sure nothing was going to happen to me."

THE PROSECUTOR: "Did you believe her?"

ELLEN: "Yes, I trusted her." (Question objected to and withdrawn.)

Defense counsel cross-examined Ellen regarding the same telephone conversation:

DEFENSE COUNSEL: "[H]ow long did you speak to [the defendant] on the phone?"

ELLEN: "I don't remember."

DEFENSE COUNSEL: "Well, at some point he said he wanted to fuck you?"

ELLEN: "Yes."

DEFENSE COUNSEL: "Okay. That's the word he used."

ELLEN: "Yes."

DEFENSE COUNSEL: "And did he say anything else along that line?"

ELLEN: "I can't remember."

defendant and Hoch, on the other hand, testified that Ellen made sexually provocative advances to the defendant on the telephone.[2] Ellen also testified that it was Hoch who wanted to go to the defendant's residence and that Hoch promised to protect her. Hoch, however, testified that Ellen was the one who wanted to meet the defendant and that no promise of protection was asked for or made. In any event, shortly after the telephone call, Ellen and Hoch traveled to the defendant's residence, a single room in a boarding house.

Soon after arriving at the defendant's room, Ellen and the defendant engaged in sexual intercourse. Hoch sat near them watching television. According to Ellen's testimony, the defendant asked her whether she "remember[ed] talking shit on the phone," locked the door when she looked at it, pushed her down on the bed, pulled down her pants, and placed his fingers in her vagina. When he said he was going to "do it," Ellen asked him to put on a condom. After putting on a condom, the defendant commenced penile-vaginal intercourse with Ellen, who repeatedly said "no" and "screamed" during the episode. The testimony of Hoch and the defendant, however, was to the effect that Ellen was a ready and willing participant.[3]

After the incident, Ellen dressed and took the defendant's telephone out of the defendant's room into the hallway of the boarding house to contact a friend. Ellen testified that she told her friend that she was raped, and that the defendant then came into the hallway, grabbed the telephone, went back into his room, and slammed the door. According to the defendant and Hoch, the defendant went into the hallway, took the telephone from Ellen and asked her to leave because she became loud (ap-

---

DEFENSE COUNSEL: "And you're telling us that that upset you."

ELLEN: "I told him no. I was just going over there to hang out with her."

[2]The defendant testified in his own defense. His credibility was impeached by his prior convictions of kidnapping, robbery, assault and battery, and larceny.

[3]The defendant testified that Ellen never said "stop" and that the defendant did not throw Ellen on the bed or force himself on her. According to the testimony of both the defendant and Hoch, Ellen was the first to make sexually provocative remarks referencing the prior telephone conversation and asked the defendant if he had a condom before any sexual contact had begun.

parently arguing with her friend) in violation of the rules of the boarding house. All agree that Ellen and Hoch left together.

Hoch then accompanied Ellen to a police station, where Ellen made a report of the rape consistent with her trial testimony. The police officer to whom the report was made testified at trial that Hoch gave a statement largely corroborating Ellen's account when questioned at the police station.[4] In her testimony, however, Hoch denied making any such statement.[5] After reporting the rape, Ellen was taken to a hospital for examination, where she again described what had occurred. No physical injury of significance was found during the examination.

The principal issue at trial was whether Ellen consented to sexual intercourse with the defendant. The resolution of that issue depended on the jury's evaluation of the credibility of the two different versions of the incident.

a. *The testimony of Ellen's mother.* In his opening statement, the prosecutor told the jury that the evidence would show that Ellen "was setup by her purported friend to be raped by the defendant" and that this friend did not protect Ellen despite her promise to do so. After Ellen had testified as described above, she was vigorously cross-examined. Not surprisingly, the cross-examination highlighted the incongruity between the alleged vulgarity of the telephone call, as Ellen had described it, and her subsequent willingness to go to the defendant's residence. Defense counsel focused on the sexually aggressive and verbally harsh nature of the defendant's word choice, painting the alleged proposition by the defendant as much more than mere sexual banter. See, e.g., note 1, *supra.* The clear implication of the questioning was that Ellen would not have gone to the defendant's residence in light of the telephone conversation unless either she intended to have sexual relations with him or her version of the telephone conversation was false.

---

[4]The police officer testified twice at the trial. During the Commonwealth's case-in-chief, he testified to the complaint made by Ellen. During the Commonwealth's rebuttal case, after Hoch had denied confirming Ellen's story to the police, the officer testified to the statement given to him by Hoch.

[5]Similarly, during the Commonwealth's rebuttal case, Ellen's mother testified that, on the night of the incident, Hoch told her that Ellen had been raped. Later, Hoch told Ellen's mother that she would not testify to the rape because the defendant had threatened her. At trial, Hoch denied ever speaking to the mother about the rape.

The Commonwealth then called Ellen's mother as a witness. She testified that Ellen lived at home and did not have "normal intellectual capacity and function."[6] The mother explained that, since ten months of age, Ellen had a "seizure disorder which made her incapacitated for a lot of different functions that the normal child could do." Moreover, the mother testified that Ellen's limited mental intellectual capacity "became apparent" when she was in fourth or fifth grade, that Ellen was placed in special needs classes in elementary, junior high, and high school, and that she could not hold a steady job. The following colloquy also took place:

THE PROSECUTOR: "[A]s a result of the intellectual deficiencies, can you describe for the jury how that manifests itself in terms of how she relates to other people, friends, peers, that sort of thing?"

THE MOTHER: "Well, I think everyone perceives themselves. We live in a perfect world, so [Ellen's] little imperfections were not socially acceptable. So [Ellen] clung —"

DEFENSE COUNSEL: "I think she's talking about how the world relates to [Ellen], not what [Ellen's] problem is."

THE PROSECUTOR: "I'll rephrase, your Honor, and narrow it down."

---

[6]At the opening of this line of questioning, defense counsel objected, arguing that "the Commonwealth is going to great length to try to play on whatever limited intellectual capacity [Ellen] has in this case," which was not "particularly relevant." The Commonwealth countered that Ellen's "low intellectual capacity" is "a central issue" because it "left [Ellen] vulnerable to being manipulated by a friend which led to the sexual abuse by the defendant." The judge concluded that testimony about Ellen's "acumen or alertness or street sense or basic intelligence" was relevant principally because "we have the unusual circumstance in which the accused is alleged to have told the alleged victim over the phone what he was going to do if he had the opportunity [and] [s]he then proceeded to his apartment ostensibly in some reliance upon protection by her friend . . . ." The judge did explain that he wanted questions in this area to be specific, rather than broad. Defense counsel asked that the judge recognize his "standing objection to all this line of questioning the mother about [Ellen's] development and prior history." The judge so recognized.

THE JUDGE: "All right."

THE PROSECUTOR: "Relative to how [Ellen] relates to what she characterizes as friends and her judgment and trust in people, could you explain that to the . . . jury?"

THE MOTHER: "She clung on to people thinking they were her friends. She trusted them too quickly. She always called everybody her friend because she doesn't understand the difference between acquaintances and friends. She held on to that so she could have, you know, her friends."

THE PROSECUTOR: "So she — would it be fair to say that she would characterize someone as a friend after one meeting?"

THE MOTHER: "Correct."

THE PROSECUTOR: "And relative to her trusting people, did that cause her problems in terms of was she victimized as a result of that."

THE MOTHER: "Absolutely."

DEFENSE COUNSEL: "Objection, your Honor."

THE JUDGE: "All right. I'll sustain the objection to the last question and answer."

Subsequent to this colloquy, the mother was asked to describe the "types of things [that] happened between [Ellen] and the people she believed to be her friends" that the mother personally witnessed. Without objection, the mother testified to having once seen Ellen's so-called friends stealing from her. She also testified that on another occasion, shortly after her daughter had agreed to leave the house with three new "friends," the mother discovered five girls beating Ellen up. At the conclusion of the prosecutor's questioning in this area, he asked whether it "would . . . be fair to characterize [Ellen] as lacking in the vernacular street smarts." The judge, however, sustained defense counsel's objection to the question.

b. *Closing argument and the judge's instruction.* In closing, defense counsel argued that Ellen's testimony was not plausible,

and that her decision to go to the defendant's house after his allegedly provocative statements belied her story of rape.[7] In response, the prosecutor pointed to the mother's testimony, specifically noting that Ellen "was desperate for friends, and because of that she mischaracterized people. Someone she only met would be her best friend. She over-trusted people as you heard from her mother. She over-trusted people, and at times they took advantage of her, and she was victimized." The prosecutor then explained that, although "after that phone conversation, most of us in her situation wouldn't have gone over there," Ellen did so only because she naively "believed" her "friend's" promise "that nothing would happen to her."[8]

The judge's instructions to the jury included a cautionary instruction that they not allow sympathy or prejudice to sway their decision. The judge emphasized that "a verdict must come from the evidence and the evidence only. . . . From that source and that source only must come the verdict. There is no room for any kind of prejudice whether the prejudice is positive or negative, that is whether it is sympathy for someone in a case or whether it is antipathy or hostility toward someone in a case. There is no room whatsoever in our process for any kind of prejudice by reason of hostility or sympathy. . . . Remember that evidence . . . is not the opening statements . . . [or] the closing statements of the attorneys."[9]

2. *Discussion.* On appeal, the defendant argues that the

---

[7]Defense counsel explained that "there are things about [Ellen's] testimony . . . that don't hang together. . . . [S]he gets on the phone and he says, 'Come on over. I want to fuck' or words to that effect. . . . Think of that. He's on the phone with somebody he doesn't know? That's his lead line in this particular case, and she goes over there because she says Stephanie says, 'Well, don't worry. Nothing will happen.' . . . She goes over there. . . . Now the Commonwealth may allege that she just doesn't have the capacity to consent or know what she's doing or that . . . she would go over and see somebody if they said, 'I want to talk to you, come over here.' Well, she's at her house. Nobody has to take her out to go there. It sounds like the only things he has in his room [are] a refrigerator, a stove, a sink, and a TV. She's got all that at home. She can do all that stuff at home. Why go there in this particular case?"

[8]Defense counsel also referenced the mother's testimony in closing argument: "And if [Ellen has] been victimized as her mother has said, she's also learned from those instances if someone gives you a hard time, get away."

[9]The judge's instruction also covered suggestions regarding how to weigh

testimony of the victim's mother that the victim was overly trusting was inadmissible character evidence, and, even if admissible for some purpose, it could only have been admitted in the form of evidence of reputation and not through evidence of the mother's personal opinion. He further contends that the mother's testimony recounting specific prior instances illustrating the victim's overly trusting nature was inadmissible as evidence of propensity. We disagree.

a. *Standard of review.* At the outset, we note that the defendant did not properly preserve at trial the objections that he advances on appeal. When the prosecutor began the line of questioning at issue, the defendant objected that the evidence was not "particularly relevant." After the judge overruled the objection, the defendant requested a standing objection to this entire "line of questioning the mother about Ellen's development and prior history." Rather than an objection to the testimony as impermissible evidence of character or propensity, the defendant's standing objection was based on relevancy alone.

We have consistently interpreted Mass. R. Crim. P. 22, 378 Mass. 892 (1979), to preserve appellate rights only when an objection is made in a form or context that reveals the objection's basis. See, e.g., *Commonwealth* v. *Fowler*, 431 Mass. 30, 41 n.19 (2000) ("Regarding the testimony of the Seattle detective, the issue was not properly preserved because the defendant objected . . . on grounds other than the constitutional issue"). See also *Commonwealth* v. *Houghtlin*, 16 Mass. App. Ct. 691, 694-695 (1983) ("Only by means of . . . *a more focused objection* . . . would the judge have been alerted to the substance of the particularized arguments now urged on appeal"). Because the basis of the defendant's objection is not the argument made on appeal,[10] we review any error the judge

the credibility of witnesses, noting that "plausibility," "the naturalness or likelihood of a witness's version of events" and whether the story seemed "natural or probable as a matter of life experience and common sense"; and "intelligence," "the intellect or common sense of a witness" are two of the guideposts that can help a juror determine "the accuracy of the witness's testimony."

[10] The defendant's standing objection as to relevance did not stop him from

made in admitting the evidence at issue for a substantial risk of a miscarriage of justice.

b. *The description of Ellen as overly trusting.* We begin with what the defendant terms the mother's "opinion testimony." It is correct that "[a]s a general rule, evidence of a person's character is not admissible to prove that he acted in conformity with that character on a particular occasion." P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 4.4.1, at 130 (7th ed. 1999). It is also correct that when character evidence is admissible (almost exclusively for some other purpose), it is usually restricted to reputation evidence.[11] See *Commonwealth v. Roberts*, 378 Mass. 116, 129 (1979). We do not, however, consider the mother's testimony to constitute character evidence.

"Character is a generalized description of one's disposition, or of one's disposition in respect to a general trait, such as honesty, temperance, or peacefulness." *Figueiredo v. Hamill*, 385 Mass. 1003, 1004 (1982), quoting Advisory Committee Notes, Fed. R. Evid. 406. Our principal concern in admitting character evidence is that a person might not necessarily act in conformity with his or her character on a particular occasion. As such, evidence of a person's character might erroneously lead a jury to conclude a person acted in a particular way simply because his character suggests that he would.[12] See, e.g., *Commonwealth v. Shine*, 25 Mass. App. Ct. 613, 614-615 (1988)

objecting to various aspects of the prosecutor's questioning of the mother on other grounds. For example, when the prosecutor asked whether Ellen's trusting people led to her being victimized, the defendant raised a successful objection. When the prosecutor asked the mother to describe incidents of which she was aware where Ellen was taken advantage of, the defendant successfully objected on hearsay grounds, but then did not object when the prosecutor asked the mother about similar incidents that she personally witnessed. When the prosecutor asked the mother whether "it [would] be fair to characterize [Ellen] as lacking in the vernacular street smarts, the defendant successfully objected.

[11]But see *Commonwealth v. Adjutant*, 443 Mass. 649, 665 (2005) (favoring admission of evidence of past specific acts of violence initiated by victim when defendant claims self-defense and that victim was first aggressor).

[12]While the principal purpose for the rule excluding character evidence is to bar "the use of character as circumstantial evidence," i.e., "character to prove conduct." 22 C.A. Wright & K.W. Graham, Jr., Federal Practice and Procedure § 5232, at 342 (1978), evidence of a person's character may also lead a jury to return a verdict improperly based on their dislike of a party rather than one based on the particular facts before them. See P.J. Liacos, M.S. Brodin, & M.

("possibility that the decedent had been an alcoholic had no relevance on the question whether he was in fact intoxicated at the time of the accident"); *Commonwealth* v. *Edgerly*, 13 Mass. App. Ct. 562, 575 (1982) (no reversible error in admission of character evidence that victim "behaved well" at a particular bar over one and one-half years).

The mother's testimony that Ellen was too trusting was not a generalized description of her disposition. Instead, the testimony described a specific manifestation, over trusting, as an unfortunate but ever-present and inescapable part of Ellen's mental disorder. It is not a character trait, but a permanent condition.[13] Such evidence is "not what is generally referred to as character evidence . . . ." *Libby* v. *State*, 109 Nev. 905, 916 (1993), rev'd on other grounds, 516 U.S. 1033 (1996) (upholding admission of evidence revealing mental and physical disabilities of victim). The mother's testimony that Ellen was trusting[14] is no more character evidence than the description of Ellen as having "limited intellectual capacity." Had Ellen been a victim of Alzheimer's disease, we would not consider testimony that she was forgetful or that she could not remember people as constituting character evidence.

The mother's explanation that Ellen's disease resulted in her being overly trusting gave the jury a clear picture of who the victim was.[15] Our courts and the courts of other jurisdictions, have, at least implicitly, sanctioned testimony relating to the

Avery, Massachusetts Evidence § 4.4.1, at 131 (7th ed. 1999).

[13]We do not hold that testimony regarding the "trusting nature" of a person that is unconnected to a mental disability escapes classification as character evidence. Indeed, there is persuasive, if not dispositive, authority that such evidence would be character evidence. See, e.g., *United States* v. *Elliott*, 23 M.J. 1, 3-5 (1986) (C.M.A.).

[14]The mother, who obviously had intimate and lengthy experience caring for Ellen, was well situated to explain to the jury how Ellen was affected by her disease. A medical expert might have bolstered the Commonwealth's case, but was not necessary on these facts.

[15]Not all descriptions of a person's emotional or mental condition are considered character evidence. For example, in *Proulx* v. *Basbanes*, 354 Mass. 559, 562 (1968), this court accepted a husband's testimony that his wife was "nervous" for a period of two years without discussing such evidence as character evidence. Additionally, summary descriptions of a person's mental or emotional state — even over a prolonged period of time — do not necessarily constitute character evidence. See *Commonwealth* v. *Russell*, 38 Mass.

mental and emotional outgrowths of a medical disorder. See *Commonwealth* v. *Rocha*, 57 Mass. App. Ct. 550, 552 (2003) (reciting mother's description of "victim's cognitive and other limitations resulting from mental retardation," most notably that victim "trusted her family members, including the defendant [accused of rape], and displayed her affection by hugging them"). Accord *B.O.* v. *C.O.*, 404 Pa. Super. 127, 134 (1991) (relying on evidence that "C.O was a man of limited intelligence . . . known to be subject to the influence of others, and overly trusting"). Similarly, we have upheld the admission of testimony regarding a person's mental or physical failings after or due to an accident without considering it to be character evidence. See, e.g., *Parker* v. *Boston & Hingham Steamboat Co.*, 109 Mass. 449, 451 (1872) ("The witness had the means of observing the plaintiff from time to time, and her testimony was as to facts within her observation and not a mere expression of opinion reached by a process of reasoning and deduction. She stated what she saw, that the plaintiff was not . . . as well as she was two months after the accident").

While it may be the case that evidence that falls close to the line between inadmissible evidence of character and admissible evidence of the manifestations of a mental disorder could be offered or used for an improper purpose such as to evoke sympathy for a victim, we rely on a trial judge to exercise discretion in admitting only relevant evidence whose probative value is not substantially outweighed by its prejudicial or cumulative nature. The weighing of the prejudicial effect and probative value of evidence is within the sound discretion of the trial judge, the exercise of which we will not overturn unless we find palpable error. See *Commonwealth* v. *Valentin*, 420 Mass. 263, 270 (1995); *Commonwealth* v. *Dunn*, 407 Mass. 798, 807 (1990).

The question of consent in this case turned on which version of events the jury believed — the one told by Ellen or the one told by Hoch and the defendant. As the judge's instructions establish, plausibility is one factor a jury may use in weighing

App. Ct. 199, 202-203 (1995) (sanctioning testimony that victim looked "real angry" and "real upset" because it helped prove a stormy relationship between victim and defendant).

credibility.[16] Here, evidence that Ellen's mental disorder caused her to be overly trusting certainly tended to make her story more plausible than it would have been without that evidence. If believed, it explained why Ellen would have gone to the defendant's residence with Hoch even after he told her that he wanted to have sex with her. The evidence both bolsters Ellen's credibility on the central issue in the case and counteracts the natural and clearly argued inference that Ellen's visit to the defendant's residence after this telephone call was an indicia of consent, and that Ellen went there specifically to have consensual sexual relations. See *Commonwealth* v. *Poitras*, 55 Mass. App. Ct. 691, 696 n.8 (2002) (complainant's reason for eventually reporting abuse relevant because "complainant's credibility, which was central to the case, was challenged . . . by questions probing why she had not disclosed the abuse earlier . . . insinuating that she had disclosed it only when . . . 'stuck' in a group home"). Cf. *Commonwealth* v. *Magraw*, 426 Mass. 589, 594, 595 (1998) ("murder victim's state of mind becomes a material issue if the defendant opens the door by claiming . . . that the victim would voluntarily meet with or go someplace with the defendant . . . or that the defendant was on friendly terms with the victim"; evidence to rebut defendant's claim that victim would have consented to be alone with him admitted as relevant). See *People* v. *Peeples*, 155 Ill. 2d 422, 473, cert. denied, 510 U.S. 1016 (1993) (victim's trusting nature relevant to explain why she would let stranger into home).

Of course, the focus of the inquiry in a consent case must be principally on the time of the act. In the circumstances of this case, the defendant's argument is in essence that Ellen's consent began with her agreement to come to the rooming house during the telephone conversation. Therefore, her reasons for going are neither tangential nor collateral to the issue of consent.[17] The judge acted well within his discretion when he determined that

---

[16]The judge also instructed the jury that intelligence or common sense of a witness is another way to gauge his or her credibility. The mental limitations caused by Ellen's disorder were also relevant to help the jury make a determination on her credibility.

[17]Even if the reason Ellen agreed to visit the defendant was a collateral matter (which we conclude it is not), the judge can, in the sound exercise of discretion, admit or exclude evidence of collateral matters depending on the

the evidence was relevant and not unduly prejudicial in the unusual circumstances of the case.[18] See note 4, *supra*. Cf. *Commonwealth* v. *Harbin*, 435 Mass. 654, 656-657 (2002), quoting *Commonwealth* v. *Marshall*, 434 Mass. 358, 368 (2001) (victim's mother's testimony admissible even though it evoked sympathy from jury because it explained "victim's presence in the crack house and . . . provide[d] 'family background information' 'to humanize the proceedings' ").

c. *Prior incidents*. There was testimony concerning two instances where the mother observed her daughter being overly trusting of people she perceived to be her friends. In both instances, trusting those "friends" led to Ellen's victimization. The defendant did not specifically object to this evidence beyond his standing objection to the entire line of questioning based on relevance.[19] The evidence was relevant. It provided examples of, and tended to corroborate the mother's testimony that, one of the manifestations of her daughter's mental disability was overtrusting people that she did not know well. This

peculiarities of the case. Cf. *Maillet* v. *ATF-Davidson Co.*, 407 Mass. 185, 188 n.3 (1990) ("properly within the discretion of the trial judge to exclude extrinsic evidence of collateral matters"). See *Commonwealth* v. *Geisler*, 14 Mass. App. Ct. 268, 279 (1982), quoting *Commonwealth* v. *Doherty*, 353 Mass. 197, 213-214 (1967), cert. denied, 390 U.S. 982 (1968) ("the judge could properly have admitted the evidence . . . . which tended to show that the victim was not within a crosswalk . . . . This evidence . . . was only of collateral significance . . . and 'the extent to which collateral matters shall be explored is in the discretion of the judge' ").

[18] The trial transcript reveals that the judge conscientiously considered his decisions to admit and exclude evidence regarding the manifestations of Ellen's mental disorder. For example, he excluded certain medical reports that would be "somewhat cumulative of direct demeanor evidence that the jury has seen and about which we might hear more from persons with first-hand information such as a parent . . . [and] it runs the risk of generating sympathy or confusion in a criminal case to a degree that would not be present in a civil case." Moreover, the judge excluded two questions (and answers) on direct examination of the mother that either constituted character evidence or were unduly prejudicial.

[19] The defendant claims on appeal that this evidence constituted evidence of prior acts of Ellen (akin to prior bad acts) admitted to prove both her character and her propensity to be victimized. We disagree. As we have already concluded, evidence of Ellen's trusting nature is not character evidence and was highly relevant. The admissibility of specific examples of this trusting nature is analytically distinct from the admissibility of evidence of prior bad acts.

manifestation, in turn, makes it more likely that Ellen trusted Hoch's alleged promise that she would protect her and bears on why Ellen would accompany Hoch to the defendant's residence if her testimony about what the defendant said to her during their telephone conversation was true.

Even if relevant, however, evidence of these prior incidents should not have been admitted if its probative value was substantially outweighed by its prejudicial effect. Our concern with the prejudice that might flow from the introduction of the details of incidents in which Ellen was taken advantage of is twofold. First, the jury might improperly use the evidence of the victim's prior victimization as evidence that it was likely that she had been victimized by the defendant. Second, the descriptions of these two prior events might lead the jury to convict the defendant based on sympathy for Ellen. See *Commonwealth* v. *Lodge*, 431 Mass. 461, 471 (2000). As the Appeals Court properly noted, evidence like this "must be received with caution, and always tested against its probative value." *Commonwealth* v. *Bonds*, 63 Mass. App. Ct. 163, 170 (2005), citing *Commonwealth* v. *Filos*, 420 Mass. 348, 357 (1995).

We first note that the evidence of prior victimization was not entirely prejudicial in nature. As the Commonwealth argues, the fact that Ellen had been mistakenly trusting and compliant with people in the past might have led the jury to conclude that she consented to the sexual intercourse.[20] Additionally, as the defendant argued to the jury at trial, that Ellen had been previously victimized might have led the jury to believe she had learned to be less trusting. See *Commonwealth* v. *Marshall, supra* at 369 ("that some of [a witness's] testimony actually aided the defendant's case — such as the fact that the defendant fought only verbally, and not physically with the victim . . . helped to reduce any alleged prejudice caused by the testimony").

More importantly, as detailed above, the judge instructed the jury forcefully on the issue of prejudice and on the need to

[20]The Commonwealth did not argue that Ellen was not capable of consenting because of her mental disorder. To the contrary, the prosecutor conceded in his closing argument that Ellen was capable of consenting to sexual intercourse.

confine their deliberations and decision to the evidence. The judge specifically noted that sympathy for one party should not play any role in the deliberative process. See *Commonwealth* v. *Watkins*, 425 Mass. 830, 840 (1997) (general assumption that "jury follow all instructions"). Cf. *Commonwealth* v. *Daley*, 439 Mass. 558, 564-567 (2003) (risk of prejudice in prosecutor's closing argument remedied by judge's prompt instruction); *Commonwealth* v. *Richardson*, 423 Mass. 180, 187-188 & n.6 (1996) (limiting instruction to jury diminishes potential prejudice of prior act evidence); *Commonwealth* v. *Roberts*, 378 Mass. 116, 127-128 (1979) ("Although there are certain situations in which the prejudice to a criminal defendant is so great that limiting instructions cannot provide adequate protection . . . the situation described [here] is not one" [citation omitted]). While the judge could have given a more pointed instruction, i.e., that evidence that Ellen had been victimized by others in the past was not relevant to and should not be considered as evidence that she had been victimized by the defendant, the defendant did not ask for such an instruction, and the instruction given was adequate to minimize the potential for prejudice.

Finally, the judge's decision to admit evidence of the prior incidents in the circumstances of this case did not amount to palpable error, although it may have approached the outer bounds of his discretion. In light of the properly admitted testimony of the mother regarding the manifestations of Ellen's mental disorder, the probative value of this additional evidence was slight and its prejudicial nature not so overwhelming. We cannot conclude that the judge erred in finding that the prejudicial nature of the evidence did not substantially outweigh its probative value. Cf. *Commonwealth* v. *Chase*, 26 Mass App. Ct. 578, 582-583 (1988) (assuming relevance of recorded messages on which defendant used inflammatory and scurrilous words "to be no more than borderline," judge did not abuse discretion in determining probative value of messages outweighed prejudice).

d. *Closing argument*. The defendant asserts that the prosecutor stepped over the line when, in closing argument, he highlighted to the jury that the victim "over trusted people" and that, at times those people took advantage of her, and that "she

was victimized." In context, it is clear that the thrust of the prosecutor's reference to Ellen's over trusting was a direct and proper response to the closing argument of defense counsel and provided an explanation why Ellen would travel to a residence to which "most of us" would not have gone in the circumstances. However, the prosecutor's reference to Ellen's having been previously "victimized" raised directly the specter that the jury would use that evidence for an improper purpose.[21]

Assuming the prosecutor's argument went too far, the defendant neither objected nor asked for an instruction on this topic.[22] We thus review the prosecutor's closing to determine whether it created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Haskins*, 411 Mass. 120, 120-121 (1991). We are not persuaded that it did. The prosecutor made reference to Ellen's victimization just once and briefly — no more than defense counsel had. The thrust of the prosecutor's argument was the consistency of Ellen's story and the immediacy of her complaint, as contrasted with what he termed the "bald faced" lies of Hoch, and the substantial self-interest of the defendant. The judge's instructions that counsels' arguments are not evidence and should not be used to decide the case, and the jury should not allow sympathy for or hostility against a party to affect their decision, further mitigated any impropriety in the closing argument. See *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 (1987).

*Judgment affirmed.*

---

[21]The prosecutor did not do substantially more in this vein than the defendant. In closing defense counsel specifically reminded the jury that the mother gave evidence that Ellen had been victimized, and then attempted to show why this prior victimization strengthened the defendant's case.

[22]The defendant asked for and received limiting instructions on other topics.